This case on today's docket is the case of Thelma Wright v. Estate of Monroe Johnson. We have Carol Cagle for the appellant, and we have Mr. Fanning for the affiliate. You may proceed. Thank you, please support. My name is Carol Cagle. I'm here on behalf of Thelma Wright. This action was originally brought on a complaint for partition of residential real estate filed by Thelma Wright in February of 2006 to recover her tenant common interest in the residence. Thereafter, in January of 2007, Monroe Johnson filed a cross-complaint for partition. After a non-jury trial in June of 2010, the trial court denied Thelma Wright's complaint, allowed Monroe Johnson's cross-complaint, and awarded the real estate in its entirety to the Estate of Monroe Johnson. And this appeal followed. I believe the facts are not overly complicated. The facts themselves are not in controversy between Ms. Wright and the Estate of Johnson. However, the inferences drawn from those facts, I believe, are in dispute. The trial court found in its ruling the existence of a fiduciary relationship, which is central to the appellate review at this time, but whether or not a fiduciary relationship existed between Thelma Wright and Mr. Johnson. And that Thelma had exercised, the trial court found she had exercised undue influence over Mr. Johnson and further found that all transactions between the parties were a sham. Can you tell me what was the nature of their relationship over the years? There was extensive testimony given by Thelma before the trial court and Mr. Johnson had passed away in 07 and he had an evidence deposition at the court review. They both agreed that they'd been friends for over 50 years. They'd never, they'd been married to other people, had a family, you had their distinct families, but had always maintained a friendship. Did she work for him during any of that period of time? When she performed, Mr. Johnson maintained, was self-employed as a garage mechanic in the city of St. Louis and she worked for Bussman Fuse as a factory worker nearby. And he would work on her car and she would wash his uniforms, sweep up around the garage, do housekeeping, cook for him. They'd perform tasks for each other and they both agreed they had been friends for over 50 years and had maintained that friendship. Was there any evidence derived from the real estate agent that drafted the deed or prepared the deed? Somebody prepared the deed, wasn't it the real estate agent? Correct. Okay. Was there any evidence about what their perception of the relationship was, overreaching or? Well, the estate of Monroe Johnson, who was seeking to set aside his original warranty deed, it's our position, I think it's clear in the law, that they had the burden of proof of going forward. No witnesses were called from the Tice Law Firm, who operates this pontoon title, who prepared both the sales agreement and the original warranty deed. No evidence was presented, Your Honor. Excuse me. The sales contract was – the facts are clear that the sales contract was prepared July 24th of 2003. The closing happened about three weeks later, August 13th of 2003. Both happened at the Tice Law Firm. In addition, it was Mrs. Wright's testimony that she never was present at Tice Law Firm without Mr. Johnson, never had any appointments or in any way tried to influence the content of those documents without him being present. Was the family members aware of the deed at the time it was created in joint tenancy? There was no evidence about that whatsoever. The only evidence presented was testimony from a granddaughter of Mr. Johnson's that she became aware of it in December of 2003, immediately prior to obtaining the emergency order of protection. Now, the standard of review is whether the trial court's decision was against the manifest, whether the evidence. There was only one transaction between the parties, which was that original warranty deed. The trial court did not – barely mentioned but did not give any legal effect to a quitclaim deed that Mr. Johnson executed on March 4th of 2004. This was several months after the order of protection matter in which he terminated that joint tenancy and created a tenancy in common. And it's our position that that does have a great legal effect because he preserved the tenancy in common interest to Mrs. Wright. When he went to his own order without her being present, there's absolutely no allegations that any influence was exerted on him whatsoever. She was at that point kept from being in contact with him. He didn't file at that time to set aside the warranty deed. He did not allege any fraud. He, through Attorney Leonard Berg, deeded – quitclaim deeded the residence to himself as a tenant in common and preserved her interest and terminated the joint tenancy. Now, for the court to find – the trial court finding that a fiduciary relationship did exist between the parties, under all the extensive case law in Illinois, the court had to find that that fiduciary relationship was established by clear and convincing evidence. And there are certain standards that are set out in the state of Guam, which is a Fourth District case from 2000, as well as in the Supreme Court case of Herbert Scheimer from 75. Now, to impute the existence of a fiduciary relationship, you have to look at the circumstances and the facts of the parties. At the time of this 03 transaction, both parties were seniors. Thelma was 76 years old. Mr. Johnson was 81. They had similar backgrounds in education. Thelma certainly did not stand in any kind of a superior position to Mr. Johnson. They did not bank together. They had never banked together. She was financially independent. She testified to that. She had a pension from her job at Westman Hughes. No evidence was presented. Wasn't there evidence, however, that he was illiterate? That's a very good point. When you look at the totality of the evidence that was presented, he took care of extensive business matters for himself without any input from her whatsoever. His wife died in the year 2000. And after she died, he thought about moving to Illinois and asked her help in locating a house. After his wife's death, he retained an attorney in St. Louis, filed a wrongful death action against a nursing home for her death, settled that cause of action. He sold his garage in the city of St. Louis without any input whatsoever from Mrs. Wright. He sold his house in Hazelwood, Missouri without any input whatsoever from Mrs. Wright. So, no, I would not say illiterate, but correctly characterized Mr. Johnson. He was well able to conduct his business affairs. His granddaughter's own testimony in the record was that he held a position of officer in fraternal organizations, that he was able to learn and comprehend the rules of those organizations. It was very important to him. I believe it was the Elks. And he'd been a lifelong businessman. He did all his own banking. He took care of his financial affairs. He had that business. He sold real estate. He engaged in litigation. He hired attorneys. He certainly was not a helpless, illiterate person in any way, shape, or form. He signed his name. He always signed checks. He stated in his evidence deposition that he was able to take care of his own affairs. After he... Why is it that she did the banking for him? She never did do the banking. Never did any banking. Never did any banking. She would write out, hand write out checks, much as the secretary would do, at his direction to pay bills, and he would sign his name. She would write out every check. He was well able to do it himself. But she said for a period of about 18 years, after his wife's eyesight became poor, she would write out checks when she'd be in his garage or in his home. She did housekeeping at his home as well after his wife died. Was she paid for any of these services? No, she was not. She was never paid. So the McCruel case, which I've also included in the brief from 47, was also a Supreme Court case from Illinois. It said the burden's on the party seeking to set aside the conveyance to prove by clear and convincing evidence that a fiduciary relationship exists. The mere fact, I think that the court's ruling was against the manifest way of the evidence, because the mere fact that she assisted him, when she was familiar with the Granite City, Illinois area, assisted him in looking at several houses, would not establish a fiduciary relationship. She had no other hand over him, and none could be inferred. This fiduciary relationship was really the crux of the trial court's finding, based on the Kerbels-Meyer case, right? That's our position, Your Honor. The court went on to make certain findings of fact to support the fiduciary relationship finding that I believe were disproven by the record. The first one is what Justice Chapman just inquired about, that Monroe Johnson had a very limited ability to read and write, and he was dependent upon Thelma Wright to help him in these matters. I don't think that anyone could find that he was dependent upon her or anyone else. She did assist him when he requested it, but he was certainly able to take care of his own business matters, and after they parted ways, after the order of protection in late 2003, he lived another four years on his own, with no assistance from anyone, was never found to be incompetent, never had anyone take care of his business. Even after the O.P., didn't he have some contact with her? Yes, he did. It was according to her testimony, yes, he in fact did. He would seek her out, visit her in her home. They would visit at restaurants. I don't think, and as incredible as it is, I don't think this litigation and the order of protection necessarily defeated their friendship. Who presented the evidence that she said she was signing as his power of attorney? Who testified to that? I believe that was in Monroe's evidence deposition. Not that she was signing as a power of attorney, but he thought his daughter was a power of attorney for him. Someone named Georgia. No one named Georgia came to testify at the trial, and no power of attorney was ever presented. I think that there is also conflicting testimony from Monroe between the transcript of the 2004 plenary O.P. hearing as compared to his evidence deposition about whether or not he ever intended for her name to be on that warranty deed, the original warranty deed. He stated at one time, he said, well, after my wife died, I figured we would buy a house together, and he guesses at one time he wanted her name to be on. At another time, he said he had no knowledge until he saw that sales agreement. Despite that, and I think this is very important, he signed the sales agreement. Three weeks went by. He went to the closing. He was certainly enough of an able business person that he knew how to stop the closing if it was not to his liking. He wouldn't have tendered his check, because he was the person that paid for this house in the amount of $35,000. But he did complete the closing, and he went home with Thelma, and they conducted their business as usual for the next four months. Is there anything in the record that indicates that his family was aware of the real estate transaction being processed and completed? The testimony of his granddaughter, who was the only family member that testified, was that when she came to the house and wanted to see a copy of the deed, and that's in December of 2003 when the emergency O.P. was obtained, that that's when she found out. I think it's not credible testimony that he would have objected to Thelma's inclusion on the sales agreement or on the deed on two different occasions to two different employees at Tice Law Firm, and that they wouldn't have stopped the closing. I think that to imply that there was fraud or undue influence at the time of those two meetings there, and especially the real estate closing, would have to infer that they were in some part of the conspiracy to defraud him and to include her name on the deed. He testified incredibly that he was told at the closing by an employee that it was too late and he'd have to hire a lawyer and there was nothing he could do about it. And I don't believe that that would have happened between a licensed attorney and a closing of sale. As well, he did, if you look at the timeline of the transactions, no action was taken until his daughter took him to get an emergency order of protection in December. Then again, so that was four months after the closing of sale, then there was another four months after the order of protection when he went to another attorney and severed the joint tenancy but filed nothing about fraud or anything to set aside the warranty deed. There's never been an action by Monroe Johnson during his life to reverse that warranty deed. There was no testimony he ever asked for. We signed the property back over to him until he filed a cross-complaint in January of 2007, four months before his death, to her partition case. How many children did he have? From reading the will, I believe he had three daughters. None of the daughters appeared or testified. The only witness was a granddaughter. It was her name, Zella? Zella. Zella, okay. And did they live in the area, the children? Yes. St. Clair County area. The court also made a second finding that Thelma knew after the death of his wife that Monroe desired to move to Illinois to be closer to individuals who could assist him as well as his family. I don't believe that that's relevant to establish a fiduciary relationship. No matter what reason he desired to move to Illinois, Thelma didn't hold his money, didn't hold his banking. She had no upper hand to dictate to him where he would live whatsoever. She did testify that after his wife died, she would spend weekends with him in St. Louis, cooking and cleaning and doing housekeeping work, and that he wanted to move closer to her. There was no contrary evidence. I'd also draw the court's attention to an Illinois Supreme Court case, an old case of Finney v. White from 1946, that talked about a deed being duly executed and delivered that cannot be impeached by subsequent declaration of the grant for. There was no act by Monroe until that order of protection was obtained that he had any problem whatsoever with the closing, and no evidence that he ever expressed at any time any dissatisfaction to the closing agents. There was no question about his competency. That never came an issue. No one ever obtained a guardianship for him. There was no competency. As well as his family moved to probate a will that was done in, and admitted a will to probate that was done in March of 04. That was months after, five months after the end of GLP. And as well, he lived on his own until his death in 07. The fourth finding made by the trial court to support the finding of a fiduciary relationship is that Monroe relied heavily on Thelma and her son Gary to secure the contract to purchase and arrange the closing. They took him house hunting. Gary helped him negotiate. Gary, the son, helped him negotiate a sale price and got it reduced. They certainly didn't act in any way in a self-dealing or contrary to Monroe's requests. Monroe took part in the negotiations as well, which is reflected in the record. There was no, any reliance or any help that he did accept from them was in no way nefarious or detrimental to him. A big point was made that Thelma's son was the one that directed them to Tice Law Firm. While Thelma's son Gary was never present for any of the meetings, he recommended it as, he testified that the only reason he recommended it is he'd use them for his real estate transactions, but he had no relationship or any reason that he was going to have any gain. The trial court went on and found that Thelma and Gary manipulated the sales contract to ensure that Thelma's name was on the deed. I don't know, and the court didn't elaborate about how she would have manipulated such a sales contract or how she would have gotten Tice to manipulate the sales contract. The court made a further point of mentioning the December emergency order of protection that was entered as a plenary after a hearing in January. The law is clear, though, in HELP, which is cited in the brief, HELP v. HELP, that subsequent acts, even assuming that Thelma committed misconduct toward him in December of 2003, he limited his testimony in the OP record that anything, any verbal abuse she gave him was in December of 2003. That was long after the real estate closing, and it was a subsequent act, and it could not be implied retroactively to a closing. Subsequent acts of misconduct to be looked upon equitably as a basis for denying, nor shall they for denying relief if they're subsequent acts. She contested the OP. She never admitted that she committed any abuse whatsoever toward him, but even assuming that she did, it was, at best, a subsequent act. Ms. Gable, your time has elapsed. You'll have the opportunity for rebuttal. Okay. Thank you, Your Honor. Thank you. Mr. Colby. Please, the Court. Ladies and gentlemen, I'll try to be brief in this situation. The question here is whether or not a fiduciary relationship had existed at the time of the transaction in which the real estate was purchased. If we look at the facts that were presented, and most of which are confirmed by Mrs. Wright, there's an established friendship for over 50 years. So as a person whom he placed significant trust in, the facts are that Mr. Johnson was illiterate. Just because a person is illiterate does not mean that they cannot function on day-to-day things as far as getting by, fixing their dinner, watching television. But it does mean that they are not able to read language and necessarily understand that. If we look at just Felton's own testimony, she admitted under oath that Mr. Johnson could not pick up a piece of paper and read that paper, let alone understand what was on that paper. She also testified, and that's on the record. Did Mr. Johnson tell you the price range for a house that he was looking for? He didn't comprehend the money like that. I went by how much he had and how much the place was, what it was sold for. I tried to figure out if it was sales tax and all that stuff isn't there, too. So she is the one deciding how much to purchase on the property, how much monies he has available. She, by her own testimony, he can't comprehend the finances necessarily. Testimony of counsel, he participated in negotiations. That's contrary to the testimony of her own client. Her own client said, who did the negotiating on the sales price? Gary did because Gary had the appraiser. Is Gary your son? Gary Wright? Yes. Would he report back to Mr. Johnson and yourself then? Well, only the one time when he got down to the price that he wanted. So when he got the price down to what Gary wanted, he then comes back and says, hey, I got this house down to an amount which I think you should purchase the property. So she knows that he cannot read and write. She knows he doesn't understand monies. She is assisting him in the search for all his different houses. It's a house that, in fact, Gary himself was interested in purchasing. How convenient. And he also sold a home in Missouri, sold commercial real estate, sold automobiles, and settled a wrongful death claim. Correct. And if you'll look at Mr. Johnson's testimony as to the date of the closing, when he became aware that Mrs. Wright's name was on the property, he objected to Mrs. Wright and said, why is your name here? Did he object to the real estate agent or the attorney? He does not. He says that he objected. He didn't really say that he objected to them, that Feldman said it was too late, paperwork was already signed, and then he let it go at that point. And he asked her at that time, why wasn't his daughter, Georgia, there, who was his POA? And his testimony was she informed him that she did not have time to get ahold of Georgia and that she was there to sign on his behalf. So at that point, he then feels like she's acting as his POA to assist him in these matters. Now, he was competent, however. I mean, being illiterate and competency are two entirely different evaluations. That is correct. He was not incompetent as far as his mental capabilities, other than he was suffering from the disabilities of being illiterate and not being able to read or write or understand finance. The December date comes into play in 03. That's when the family first becomes aware of the deed, when they ask Mrs. Wright to present that deed, to ask where they could find it, and then she finally presents it to them, and they then explain that to – or the granddaughter explains that to the grandfather what the current situation is. All of these factors that existed establishes – It was interesting, though. Wouldn't he have known at the time of the closing that her name was going to be on the deed? At the date of the closing, he saw that Thelma's rights under his testimony and his evidentiary deposition, he saw that her name was on it, and he objected to it. And they said it was too late. Right. And then he signed it knowing that it was a deed with her name on it. And Thelma represented to him that she was there signing it on behalf of him as his POA since Georgia could not be there. So his understanding is she's there signing, putting her name on the deed as a POA, not necessarily as a beneficiary interest in that property. But he knew he had a POA. I'm sorry? He knew he had a power of attorney in his daughter, right? Correct. So he knew how that all worked, how to get somebody your power of attorney. He never gave this woman a power of attorney to her, right? That's correct. He did not give her a power of attorney. I mean, he had enough knowledge to know you don't become a power of attorney just because somebody says, I'm doing it as your power of attorney. Well, he believed that she was acting as a POA. She executed, she filled out his checks, took care of his bills and handled those things for him. Clearly, whether he's competent or not, she is still placed in a position of trust. She still is placed in that position to where this person is depending on her to make financial decisions in his best interest in the purchase of this home. The key factor here is whether, okay, let's just say whether or not placing her, when a person's name is placed on a deed, there's a presumption that that person may have intended to put that person as a gift. That's one of the factors when you look at a person when their deed puts that individual on them. Here, by Mrs. Wright's own testimony, she was not put on that deed in her version of the facts. This wasn't a gift to her. This was a contract in her version that this was a contractual obligation between the two parts. If I promise to care for you for the rest of your life in exchange, then you're going to put me on the deed to this property. Just taking her version into that, then it's a contractual relationship that was not fully fulfilled. He continued to live for another, I think, approximately four years before he passed, of which she did not provide the care. Because she had an O.P. against her, right? Correct, because of her actions. You can't care for somebody if you've got an order of protection and you can't be around somebody. Yeah, but if you can't fulfill your terms of the contract because of your own wrongdoing, you can't then benefit from that contract. If you're the one abusing the adult, which the court found that there was abuse, both physically, verbally, as well as financial exploitation, and that's why the order of protection was issued, and it was found that Thelma Wright was the one who did these things. So then for her to sit back and say, well, I don't benefit from this contract. I wasn't allowed to provide for the care of this individual, so therefore I still should be entitled to my payment. So just taking her version of the contract shows that she couldn't perform those contracts, but it was because of her own actions and not necessarily anything that Mr. Wright had a part in. Just because he entered into this contract doesn't mean that Mr. Johnson has an obligation to suffer under the abuse and neglect of an individual, as far as putting forth in that contract. The court, though, the trial court, found that the evidence did establish a fiduciary relationship, and when the court found that there established a fiduciary relationship, the burden then shifts to the recipient of those proceeds to show by clear and convincing evidence that this was not necessarily done by fraud or duress or undue influence. The court found that there was no evidence presented by her that was any legitimate justification that her name was – in fact, just to the opposite of that. She was aware of his desire to move to Illinois, that he relied on her in handling every aspect of that transaction as far as the purchase of that. So I think, in fact, the evidence is clear and convincing that there was a fiduciary relationship that existed at the time. The counsel states that his daughters were present, but she didn't necessarily – they didn't testify as to him because the facts that were being brought before the court was the facts that were surrounding the circumstances in which the sale of the transaction occurred, which was back in July, and the family wasn't aware that the transaction had gone astray until December of 2003. And at that point, the facts that was relevant to the court was what was occurring and what was going on between Mrs. Wright and Mr. Johnson at the time of the sale of the transaction. The similar type of conduct was also determined, but she tried to even financially exploit him through his life insurance, trying to transfer her name as a beneficiary, which then was subsequently aborted once the family became aware of it. I think to say that there was not a fiduciary relationship would be totally – in fact, would be against the manifest way of the evidence, given the fact that everything was negotiated. He did not understand finances. He could not read or write. They handled all the negotiations. They chose the house, the location, set up the closing, told him where to be, transported him, handled every aspect, and even according to Mr. Johnson's testimony, she even assured him that she was acting as his POA or on his behalf in that case, like she had acted on his behalf in assisting him in writing all his checks, going to the bank, and getting the draft with him for the purchase of the property. And as such, I think – and the trial court is in the best position to judge the credibility of the witnesses and the testimony, and obviously the standard is against the manifest way of the evidence, and absent that, the trial court's opinion should be upheld, and as such, the appellee would ask the court to uphold the trial court's decision. Thank you, Mr. Fanning. Ms. Tango, do you have a follow-up? Yes, Your Honor. Just a short follow-up. I'm surprised that Mr. Fanning has characterized the record as he has. It's a direct testimony in his evidence deposition by Mr. Johnson in response to his own attorney's questions, that that conversation about it's too late and he'll have to get a lawyer, that wasn't a conversation he had with Thelma Ride. That's a conversation he had with an employee. It's on page – At the Tice Law Firm? Yes, it was a conversation. Why didn't you tell her to take her name off of it? I did, and she said we already signed it. Well, did you tell the title people? Yeah, I told the title people. What did they say to you? They said it was too late, I had to get a lawyer. Who told you that? I don't know some woman over there. I asked her – this is his answer – could I get that name off of that title, and she said it's too late. And I said, what do you mean too late? She said, well, it's just too late, you need to get a lawyer. Question, was this before everyone broke up and left there that day? Answer, yeah. And I think that's incredible testimony to believe that the closing agent and the attorney at Tice Law Firm that closed the transaction would engage in it. There was some super conspiracy to put her name on a deed that he opposed. It certainly is evidence that he was aware of it being on the deed at the time of the closing. And no action was taken, and they resided together until the order of protection. As well, after the order of protection, he took no action another three months or so until all he did was sever a joint tenancy and create a tenancy in common. And I emphasize this because I feel it's very important. When he did do an affirmative act without any input from her whatsoever, he didn't file fraud or ask to have that deed set aside. He only terminated a joint tenancy with right of survivorship, with legal counsel and advice. As well, the life insurance mention that Mr. Fanning did. The records, Claire, she submitted no change of beneficiary. There was a $5,000 policy that left whose beneficiary was his now deceased wife. She changed the beneficiary for a death benefit, left a drawer for his signature. It was never signed by anyone and never submitted. I think it's clear upon review of this matter that a fiduciary relationship was not established. As such, there was no presumption that the warranty deed was fraudulent. And we're asking the court to restore Mrs. Wright's tenancy in common interest in the residence. Thank you, Your Honors. Thank you, Ms. Stegall. Thank you, Mr. Fanning, both for your arguments and brief. We'll take the matter under advice.